UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SAM WILLIAMS,                          )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )          Case No. 4:07CV01409 ERW
                                       )
FRANKLIN D. CHAMBERS, et al.,          )
                                       )
          Defendants.                  )

**AMENDED MEMORANDUM AND ORDER**

This matter comes before the Court on Defendants' Joint Motion for Summary Judgment
[doc. #34].

## I.     PROCEDURAL BACKGROUND

On August 7, 2007, Plaintiff Sam Williams ("Plaintiff"), acting individually and as

representative of the estate of Jeffrey W. Williams, deceased, filed a Complaint against

Defendants Franklin D. Chambers, George W. Arnold, Aaron J. Pinson, Matthew Vogeler, and

Phelps County, Missouri (collectively, "Defendants").  The lawsuit arose out of an incident

involving Plaintiff's deceased son, Jeffrey W. Williams, and various police officers, which

occurred on August 20, 2005.  The Complaint includes a total of fourteen counts, which can be

divided into three general claims: 1) 42 U.S.C. §§ 1983 and 1988 claims of unreasonable and

excessive force against Defendants Chambers, Arnold, Pinson, and Vogeler (Counts I-IV); 2)

supplemental state law wrongful death claims against Defendants Chambers, Arnold, Pinson,

Vogeler, and Phelps County (Counts V-IX); and 3) supplemental state law personal injury claims

against Defendants Chambers, Arnold, Pinson, Vogeler, and Phelps County (Counts X-XIV).

Defendants filed the pending Motion for Summary Judgment [doc. #34] on March 30, 2009.

## II.    BACKGROUND FACTS[1]

Turning now to the facts of this case, on August 20, 2005, Defendant George Arnold, a

Sergeant with the Missouri State Highway Patrol,[2] was assigned to work a highway construction

overtime project on a busy section of Interstate 44.  On that day, Sergeant Arnold encountered

Jeffrey Williams on Interstate 44 four separate times.  He first encountered Mr. Williams at 3:30

p.m., when he stopped his Highway Patrol vehicle on the side of the highway to ask Mr. Williams

if he could render any assistance.  At that time, Mr. Williams was sitting in a maroon truck parked

on the shoulder of eastbound Interstate 44, near the 176 mile marker in Phelps County.  Mr.

Williams told Sergeant Arnold that he was going to a baseball game in St. Louis and his vehicle

had run out of gasoline.  He said that he had help coming from Springfield and he declined

Sergeant Arnold's offer of assistance.  Sergeant Arnold noted that the vehicle displayed an Iowa

temporary vehicle registration, and Mr. Williams told Sergeant Arnold that the vehicle was owned

by his mother, and he gave Sergeant Arnold his mother's name.

---

[1]The Court's recitation of the facts is taken from Defendants' Joint Statement of Uncontroverted Material Facts [doc. #33]; Plaintiff's Statement of Material Facts [doc. #46]; and Defendants' Reply to Plaintiff's Statement of Material Facts [included in doc. #50].  The Court also considered the exhibits submitted by the Parties, where appropriate.

[2]Sergeant Arnold has been employed as a state trooper since November 1, 1994.

Defendant Franklin Chambers, a Lieutenant with the Missouri State Highway Patrol,[3] was also working the highway construction overtime project along Interstate 44 on August 20, 2005. At approximately 5:30 p.m., Lieutenant Chambers noticed an abandoned truck on the side of Interstate 44, and contacted Sergeant Arnold, who told Lieutenant Chambers that he had already checked on the truck, and that the driver of the vehicle stated that he was out of gas and had help on the way. As Lieutenant Chambers continued driving westbound, he observed a man walking westbound along the center median of Interstate 44, and correctly assumed that he was Mr. Williams, the driver of the truck. Mr. Williams was wearing black shorts, a tank top, and a pair of flip flops. Lieutenant Chambers stopped to offer assistance to Mr. Williams, who told Lieutenant Chambers that he was out of gas and money and that his brother was coming to get him. Lieutenant Chambers offered to take Mr. Williams to get gas or leave him at a public restaurant in Doolittle, Missouri, but Mr. Williams refused the offer. Mr. Williams asked to use Lieutenant Chambers' cell phone and Lieutenant Chambers allowed him to make two phone calls. During the second phone call, Mr. Williams asked Lieutenant Chambers to drive him to Waynesville, but added that he would not ride anywhere with Lieutenant Chambers unless he was allowed to continue to talk on the cell phone for the duration of the ride. Lieutenant Chambers found this request odd and explained to Mr. Williams that he was working in the construction zone and that he could not allow Mr. Williams to use his state cell phone for that purpose. Mr. Williams became visibly agitated and began waiving his arms in the air. Lieutenant Chambers again offered

---

[3]Lieutenant Chambers has been employed as a state trooper since January 1, 1984. On August 20, 2005, he was a lieutenant, but after that time he was demoted from lieutenant to sergeant. He was demoted because he was unable to adequately conduct his administrative duties as a staff officer. The demotion was based on a series of events that did not relate to this incident or case.

to give Mr. Williams a ride to Doolittle, Missouri, but Mr. Williams said that he wanted to keep walking.

At approximately 5:30 p.m., Sergeant Arnold was driving eastbound on Interstate 44, when he saw Mr. Williams a second time. As he approached, he observed Lieutenant Chambers speaking to Mr. Williams on the inside shoulder of westbound Interstate 44. Sergeant Arnold immediately recognized Mr. Williams as the man to whom he had offered assistance at 3:30 p.m. Sergeant Arnold noticed that Mr. Williams had left his vehicle and walked westward along the interstate. Sergeant Arnold parked his vehicle on the inside shoulder of eastbound Interstate 44and briefly watched Mr. Williams as he talked to Lieutenant Chambers. It appeared to Sergeant Arnold that Mr. Williams was upset because he was waiving his arms in the air and Sergeant Arnold could hear Mr. Williams' voice from across the median. Sergeant Arnold got out of his car and walked across the median to investigate.

As Sergeant Arnold approached the men, Mr. Williams looked at Sergeant Arnold and asked Sergeant Arnold to take him to Waynesville. Sergeant Arnold told Mr. Williams that he could not do so, and Mr. Williams became upset. Lieutenant Chambers told Sergeant Arnold that he had offered Mr. Williams a ride to Doolittle, Missouri, but Mr. Williams had declined. Mr. Williams asked Lieutenant Chambers if he could walk to Waynesville and Lieutenant Chambers told him he was free to go. Mr. Williams continued walking westbound along the inside shoulder of Interstate 44. Neither Lieutenant Chambers nor Sergeant Arnold asked for Mr. Williams' driver's license or learned his name during this encounter.

After this second encounter with Mr. Williams, Sergeant Arnold suspected that Mr. Williams might be under the influence of drugs. Sergeant Arnold told Lieutenant Chambers about

his first encounter with Mr. Williams, and stated that he had some suspicions about the ownership of the vehicle that Mr. Williams was sitting in earlier. Sergeant Arnold discussed with Lieutenant Chambers how it was unusual that Mr. Williams had said that he was going from Springfield to a St. Louis Cardinals game, but that he ran out of gas and had no money. Those facts, combined with the vehicle's out-of-state temporary tag and the lack of verification that Mr. Williams had permission to drive the vehicle, caused Sergeant Arnold to become suspicious and want to verify the owner of the vehicle.

Lieutenant Chambers told Sergeant Arnold to attempt to find the vehicle owner's name and verify that Mr. Williams had permission to drive it. Sergeant Arnold returned to the truck and recorded the VIN, and then used his mobile computer to determine that the listed owner was Mary Beard of Burlington, Iowa. Sergeant Arnold asked the Highway Patrol radio operator to contact the owner, but the radio operator was unsuccessful. Sergeant Arnold informed Lieutenant Chambers that he was unable to contact the registered owner, but stated that he intended to find Mr. Williams in order to identify him and possibly get the telephone number of the truck's owner.

At 6:12 p.m., Sergeant Arnold located Mr. Williams walking at a very fast pace along the inside shoulder of westbound Interstate 44, about one-half mile west of the location of the prior encounter. Sergeant Arnold stopped his car on the outside shoulder and directed Mr. Williams to come to him when it was safe to cross the westbound lanes. Lieutenant Chambers arrived and parked his vehicle behind Sergeant Arnold's vehicle. The troopers spoke to Mr. Williams together on the interstate shoulder in front of their parked patrol vehicles. During this third encounter, Sergeant Arnold observed that Mr. Williams was very hyper in his movements, and he

had extreme difficultly being still. After seeing Mr. Williams' constant movements, Sergeant Arnold became nervous and concerned for Mr. Williams' safety, since they were standing beside the interstate where traffic was moving 70-75 miles per hour. Sergeant Arnold told Mr. Williams to get away from the shoulder of the roadway, that he was going to get run over, but Mr. Williams refused. Mr. Williams was constantly moving and walking toward the edge of the roadway, even stepping onto the traveled portion of the highway. Sergeant Arnold directed Mr. Williams to sit down for his own safety. Mr. Williams initially sat down on the pavement, but then he immediately sprang to his feet. He quickly lowered one of the two pairs of athletic shorts that he wore, raised his hands into the air and stated, "I don't have anything."

Mr. Williams stated that he did not have his wallet with him, but identified himself as Jeffrey Williams, and gave his date of birth. Mr. Williams stated that he had his mother's permission to drive the truck, so Sergeant Arnold wanted to verify that Mr. Williams' mother was the registered owner of the vehicle. Sergeant Arnold called a cell phone number that Mr. Williams provided and spoke with a woman who identified herself as Mr. Williams' grandmother, and who verified Mr. Williams' name and date of birth. Mr. Williams' grandmother confirmed that Mr. Williams' mother owned the truck and that he had permission to drive it. After Sergeant Arnold spoke with Mr. Williams' grandmother, Mr. Williams was adamant about walking to Waynesville. The officers permitted Mr. Williams to leave, and he walked away, crossing onto the outside shoulder of eastbound Interstate 44. Sergeant Arnold and Lieutenant Chambers left the area.

After Mr. Williams left the troopers and continued his walk down the side of the interstate, Sergeant Arnold decided that he should request a computer check on Mr. Williams. At

approximately 6:24 p.m., he contacted Troop I and requested a computer check, which revealed an outstanding Stafford Municipal Court capias misdemeanor warrant for a DWI traffic offense, calling for the arrest of Mr. Williams. Based on the identification of Mr. Williams as the subject of the outstanding capias arrest warrant, Lieutenant Chambers and Sergeant Arnold decided to arrest Mr. Williams.[4] Based on Mr. Williams' agitated behavior during the earlier contacts, Sergeant Arnold believed that a confrontation might occur, and he informed the radio operator of this belief. For safety reasons, and because both troopers were smaller in stature than Mr. Williams,[5] they decided to arrest Mr. Williams together. Sergeant Arnold did not call for back-up because he believed that he and Lieutenant Chambers together could handle taking Mr. Williams into custody.

At approximately 6:28 p.m., Lieutenant Chambers and Sergeant Arnold located Mr. Williams walking along the outside shoulder of westbound Interstate 44, near the Little Piney River Bridge. Mr. Williams was walking very fast down the hill; he had walked about one mile since the officers' last contact with him 15 minutes earlier. The temperature at that time was approximately 86 degrees. Upon locating Mr. Williams, Sergeant Arnold parked his vehicle on the outside shoulder of the interstate, exited the car, and immediately confronted Mr. Williams. Sergeant Arnold told Mr. Williams, "Sir, there is a warrant for your arrest, turn around and put your hands behind your back." Mr. Williams did not comply, rather he just stood there and did

---

[4]Under Missouri law, it is a crime for a law enforcement officer to fail to execute an arrest warrant, specifically including a capias warrant. *See* Mo. Rev. Stat. § 575.180.

[5]Mr. Williams was athletically built, bigger than either Highway Patrol officer. He was 6-feet, 2-inches tall, weighed approximately 184 pounds, and was very strong. Lieutenant Chambers was 5-feet, 8-inches tall and weighed 170 pounds, while Sergeant Arnold was 5-feet, 8-inches tall and weighed 165 pounds.

nothing. Sergeant Arnold attempted to secure Mr. Williams' left arm by placing it in an arm bar, while ordering him down to the ground. Sergeant Arnold wanted to get Mr. Williams on the pavement so that he could handcuff him for the safety of both the officers and Mr. Williams himself. Mr. Williams eventually dropped to one knee. Lieutenant Chambers arrived a few seconds behind Sergeant Arnold, and grabbed Mr. Williams' right arm while giving him verbal commands to get down on the pavement. Mr. Williams began moving uncontrollably, flailing around and resisting the arrest. He moved around in such a way that it became impossible for the two officers to control him. Additionally, because of Mr. Williams' agitation, movement, and sweaty arms, it was difficult for the officers to hold on to him. Sergeant Arnold yelled to Mr. Williams, "Stop resisting, stop resisting," but Mr. Williams continued resisting with more force.

As Mr. Williams faced away from Sergeant Arnold, Sergeant Arnold tried to apply a lateral vascular neck restraint by putting his left arm around Mr. Williams' neck and placing the left side of his head against the back of Mr. Williams' head. Sergeant Arnold yelled, "Stop resisting," two or three times before Mr. Williams dropped to the ground and started turning. This knocked Sergeant Arnold off balance and caused him to lose his grip on Mr. Williams. Because of the way Mr. Williams spun around and brought his feet to where Sergeant Arnold's legs were, it appeared to Lieutenant Chambers that Mr. Williams was trying to knock Sergeant Arnold off his feet through the use of a ground fighting technique.

Lieutenant Chambers sprayed two one-second bursts of OC pepper spray in Mr. Williams' face from about four feet away, as Mr. Williams was lying on his right side. The pepper spray seemingly had no effect on Mr. Williams. However, because Sergeant Arnold was positioned on the ground near Mr. Williams, the pepper spray hit Sergeant Arnold's face and eyes, causing pain

and affecting his vision. Additionally, because Sergeant Arnold was sweating, the pepper spray on his face rolled into his eyes. Sergeant Arnold's vision had become distorted, and his eyes and skin began to burn from the pepper spray, but he continued his efforts to restrain Mr. Williams.

Mr. Williams started to get to his feet. Lieutenant Chambers attempted to grab and restrain him, and he reached behind Lieutenant Chambers and grabbed the bottom of his holster. Lieutenant Chambers stated that Mr. Williams probably could not see where he was reaching because Lieutenant Chambers was behind him and they were facing in the same direction. Nevertheless, Lieutenant Chambers feared that Mr. Williams was attempting to reach his weapon, so he pivoted to the right rear, dislodged Mr. Williams' grip on the holster and pushed him away. Mr. Williams then stood up in the roadway and Lieutenant Chambers sprayed him again with pepper spray. The pepper spray again appeared to have no effect on him. A blow from Sergeant Arnold's expandable baton to Mr. Williams' right knee also did not have any effect on him.

On the part of the interstate where the altercation was taking place, eastbound traffic was only utilizing one of three lanes because of road construction. Eastbound traffic had stopped at some point, and Mr. Williams continued moving all over the roadway in a resistant manner. The troopers continued to tell Mr. Williams to "stop resisting." Lieutenant Chambers attempted to control Mr. Williams by using his own knee to strike the inside of Mr. Williams' thigh. By this time, Mr. Williams was upright and mobile, and was attempting to evade arrest by backing away across the highway, while Sergeant Arnold and Lieutenant Chambers continued to attempt to control him. Mr. Williams and the troopers eventually ended up fighting in the middle of Interstate 44.

As Mr. Williams moved toward the center of the roadway, a truck stopped at the east end of the bridge. Mr. Williams stood in front of the truck, pulled one pair of his shorts down, raised his arms high in the air, crouched slightly, and yelled at the officers, "See I don't have anything!" The officers were temporarily able to contain Mr. Williams by holding him against the front of the truck, but they were unable to get his arms into position to handcuff him. During the struggle, Lieutenant Chambers was able to use his radio extender to notify the Patrol's Troop I radio dispatcher that they needed assistance. At approximately 6:29 p.m., Missouri State Highway Patrol central radio reported that the troopers were fighting with Mr. Williams. Phelps County Sheriff's Deputies and other patrol officers were dispatched to assist the troopers.

Eventually, the two troopers were able to force Mr. Williams to the pavement again. At this point, Mr. Williams and the two troopers were positioned on the inside shoulder of the road between the stopped truck and the guardrail. There was about six feet of space between the truck stopped on the roadway and the guardrail. The troopers leaned across Mr. Williams and pinned him to the ground, trying to hold him down and get control of him. Lieutenant Chambers was near Mr. Williams' upper body, around his head, and Sergeant Arnold was around Mr. Williams' feet; Mr. Williams was lying prone to the ground. Sergeant Arnold had one of his knees alongside Mr. Williams' back, leaning into the side. He testified that his knee was not on the ground, but it was not actually up on Mr. Williams' back either. Mr. Williams continued to move uncontrollably and continued to resist, even after he was lying prone on the ground. During the struggle, Lieutenant Chambers suffered a dislocated finger on his left hand. Sergeant Arnold was in fear for his life because he could not see clearly (due to the pepper spray), because Mr. Williams was still resisting, and because Mr. Williams was moving around in a manner that Sergeant Arnold

believed was an attempt to grab the officers' weapons. Sergeant Arnold motioned several times for the driver of the truck to come help, but he refused. Traffic then began moving again along Interstate 44.

At this point in the struggle, Mr. William Prestage, who was driving eastbound on Interstate 44, approached the area where the troopers were struggling with Mr. Williams. Mr. Prestage noticed the state troopers' patrol cars on the right side of the road and then looked to his left and saw people on the ground. Mr. Prestage saw Mr. Williams on his stomach on the ground, with one trooper at Mr. Williams's feet and the other trooper trying to get Mr. Williams' arms behind his back. He noticed that both troopers looked exhausted and tired. It looked like one trooper's arm was hurt and the other trooper had his eyes closed. The troopers could not hold Mr. Williams. Mr. Prestage sped up ahead of the cars in front of him and pulled over into a lane alongside the troopers that was blocked off. He rolled down his window, yelled that he was a military policeman, and asked the troopers if they needed his help. One of the troopers said yes, so Mr. Prestage got out of his vehicle to aid the officers.

At that time, Mr. Williams was lying prone on the ground and Lieutenant Chambers was at the side of his upper body, Sergeant Arnold was at his legs, and they were holding him down with their hands. Sergeant Arnold testified that he was using just enough pressure to keep Mr. Williams' legs from coming up off the ground. Mr. Williams was moving around, trying to get up; he was already on his stomach and his hands were behind his back, but the troopers could not get the handcuffs on him. With the assistance of Mr. Prestage, they were able to place handcuffs on Mr. Williams. When Mr. Williams was handcuffed, he was lying prone, approximately three to four feet from the yellow line on the inside shoulder of Interstate 44. At this time, there was one

state trooper at Mr. Williams' legs, and another trooper and Mr. Prestage were on either side of Mr. Williams' upper body, holding him down with their hands.

Immediately after Mr. Williams was handcuffed, he was not struggling and he was not trying to get up. The troopers asked Mr. Prestage if he or his wife had water, Mr. Prestage yelled to his wife, and she brought some no more than one minute later. During this time, the three men had their hands on Mr. Williams to hold him down, and Mr. Williams continued to just lie there. Mr. Williams was speaking, but Mr. Prestage did not pay attention to what he said. Mr. Prestage asked Mr. Williams to turn his head and Mr. Williams did so. Mr. Prestage poured water across Mr. Williams' eyes to wash his face. Mr. Williams was not struggling during this process; he was on the ground and wasn't moving.

After the handcuffs were placed on Mr. Williams, Lieutenant Chambers did not believe that his life was in immediate danger, and he did not believe that Mr. Williams posed a threat of serious physical injury to him or the public, except for the fact that they were beside an interstate highway. Sergeant Arnold still considered Mr. Williams to be an immediate threat to him, but he did not consider Mr. Williams to be an immediate threat to the public.

Mr. Williams began to struggle again and then he started to attempt to get up. Mr. Prestage told the officers, "He's trying to get up, he's trying to get up." Mr. Prestage knew that Mr. Williams could not get up from his position on his stomach, but he thought that he might be trying to roll over onto his back so that he could sit up or get up. Sergeant Arnold was concerned that Mr. Williams could flip over and kick the troopers. Mr. Prestage went back to Mr. Williams' side and put his hand on Mr. Williams' back to keep him from getting up. Mr. Prestage stayed there for a few minutes. During this time, Mr. Williams was coherent and talking. Lieutenant

Chambers restrained Mr. Williams' upper body area, while Mr. Prestage restrained him in the chest area of his back. Sergeant Arnold restrained Mr. Williams' legs and ankles for a short period, exerting just enough pressure to keep them from coming up. Mr. Williams still had freedom of movement while he was being restrained, but he did not try to get up anymore. While all of this was taking place, traffic was driving by mere inches away. As Mr. Prestage and the troopers sat on the roadside with Mr. Williams, who was no longer struggling, Mr. Prestage could hear sirens coming. The police vehicles associated with the sirens were traveling westbound on the other side of the highway, and contained Defendant Aaron J. Pinson and Defendant Matthew Vogeler, full-time Sheriff's Deputies with the Phelps County Sheriff's Department.[6]

Deputy Pinson and Deputy Vogeler were on duty in separate Phelps County Sheriff's Department vehicles when they received a call at approximately 6:30 p.m. from the Rolla Police Department dispatcher that reported that two troopers were in a fight with a subject on the side of the highway. The deputies both drove separately to the scene. Because they were traveling westbound, they drove past the scene, but then came back eastbound on the highway to the location of the struggle. When Deputy Vogeler first drove by the scene, he noted that Mr. Williams was struggling with the two troopers; he also saw a white male that he presumes was Mr. Prestage waving from the eastbound side, near the guardrail, from a position near the middle of Mr. Williams' body. From the other side of the highway, it appeared that Sergeant Arnold was near Mr. Williams' legs, holding them down. Deputies Vogeler and Pinson arrived at the scene at approximately the same time and exited their respective vehicles simultaneously.

---

[6]Neither Deputy Pinson nor Deputy Vogeler is currently in paid employ with Phelps County Sheriff's Department.

After exiting his vehicle, Deputy Vogeler noted that Mr. Williams was still moving his legs and feet and squirming on the ground while handcuffed, attempting to get away from the officers by inching along the ground. At this point in the encounter, Mr. Prestage was in the middle of Mr. Williams' body, holding him down, and Sergeant Arnold was holding Mr. Williams' legs. Lieutenant Chambers was still restraining Mr. Williams' upper body, but with a lesser amount of force than he previously exerted, to ensure that Mr. Williams could not get up on his feet and leave the scene of the arrest. Deputy Pinson recalled seeing Mr. Prestage actually laying down with his torso on top of Mr. Williams at one specific point in time. However, Mr. Prestage testified during his deposition that he only placed his hands on Mr. Williams' back, and that his knees were on the ground, never on Mr. Williams.[7]

Although he was aware of no formal structure that governed the situation, Deputy Vogeler allowed Lieutenant Chambers to give orders and make command decisions because it was the Highway Patrol's arrest scene. Upon arriving at the scene, Deputy Pinson was asked by Lieutenant Chambers to relieve Sergeant Arnold in holding Mr. Williams' feet, so that Sergeant Arnold could walk away from the scene and use water to decontaminate his eyes. Deputy Vogeler relieved Lieutenant Chambers in restraining Mr. Williams' upper body. Before he was replaced by Deputy Vogeler, Mr. Williams briefly spoke to Lieutenant Chambers, but Lieutenant

---

[7]Plaintiff suggests that Deputy Pinson testified that when he arrived at the scene, Lieutenant Chambers, Sergeant Arnold, and Mr. Prestage were all "actually on top of [Mr.] Williams." (Pl.'s Material Facts, doc. #46, p.18 ¶143). However, this suggestion is incorrect. Although Deputy Pinson initially stated that the three men were on top of Mr. Williams, shortly thereafter he clarified by stating: "Let me clarify . . . what I said just then. Yeah, sure, what I meant on top of, that's misleading. There were three people there that were obviously involved in the fight when I got there. Saying all three of them were piled on top of him, on his back, that would be a wrong assumption." (Pinson depo., doc. #47-7, p.82-83).

Chambers could not understand what he was saying, as Mr. Williams was speaking very softly. Deputy Vogeler knelt alongside Mr. Williams on one knee near Mr. Williams' face, and rested one hand on his right shoulder. Deputy Vogeler used only minimal force to restrain Mr. Williams. The purpose of the almost non-existent downward pressure that was maintained on the upper body of Mr. Williams by Deputy Vogeler was to warn him if Mr. Williams attempted to roll or get up suddenly. At this point in the encounter, due to the proximity of moving traffic on the interstate, Deputy Vogeler was concerned that Mr. Williams might get up and attempt to run away through the traffic, resulting in injury to himself, an officer, or a member of the public. Once Deputy Vogeler and Deputy Pinson took over for the troopers, Mr. Prestage took his hands off Mr. Williams and got up. At this point, Mr. Williams was not resisting and was not trying to get up. Mr. Prestage left the location of the struggle and returned to his vehicle.

Lieutenant Chambers requested that Deputy Vogeler get Mr. Prestage's information, and Deputy Vogeler did so. While Deputy Vogeler was talking to Mr. Prestage, Lieutenant Chambers briefly told Deputy Pinson that they had attempted to arrest Mr. Williams and a fight ensued, during which he injured his finger. While restraining Mr. Williams at his feet and lower body, Deputy Pinson felt Mr. Williams moving his legs, and believed that Mr. Williams might be struggling. In response to a question about whether Mr. Williams might have been struggling to breathe, Deputy Pinson responded that he did not know. Although Mr. Williams was handcuffed, Deputy Pinson considered him to be an immediate threat. Based on his past experience and training, Deputy Pinson did not believe that a handcuffed suspect was helpless. Deputy Vogeler did not consider the handcuffed Mr. Williams to be an immediate physical threat to him personally, but he did consider Mr. Williams to be a flight risk.

When Deputy Vogeler returned to where Mr. Williams was laying, Mr. Williams was still handcuffed. Deputy Pinson resituated to Mr. Williams' upper body and Deputy Vogeler observed that Mr. Williams had stopped moving. Mr. Williams was still lying prone at this point. Deputy Vogeler asked Mr. Williams several times for his name and whether he was okay, but Deputy Vogeler did not hear Mr. Williams respond. Deputy Vogeler also thought that Mr. Williams' color looked ashen. Deputy Vogeler and Deputy Pinson rolled Mr. Williams over. Deputy Vogeler observed Mr. Williams' chest moving in and out and he found Mr. Williams' pulse. Due to the heat and the physical nature of the struggle and because Mr. Williams' behavior indicated a likelihood of recent drug use, Lieutenant Chambers had previously requested an ambulance be sent to check on Mr. Williams and assist with the decontamination of pepper spray. At approximately 6:43 p.m., Lieutenant Chambers radioed and asked that the ambulance be expedited. Lieutenant Chambers asked Deputies Pinson and Vogeler to sit Mr. Williams upright to assure an open airway, and they rolled him onto his back and sat him upright. Mr. Williams' body was leaned against Lieutenant Chambers' knee for support. Once Mr. Williams was in a seated position, his color looked better. Lieutenant Chambers noted that Mr. Williams was lethargic and Deputy Vogeler noted that Mr. Williams' eyelids were not fully open, but Deputy Vogeler could see Mr. Williams' eyes moving or wiggling around. Deputies Pinson and Vogeler saw that Mr. Williams was breathing when they sat him up. Lieutenant Chambers confirmed that Mr. Williams was breathing and had a pulse. Mr. Williams was still handcuffed at this point and remained unresponsive.

Almost immediately after Mr. Williams was sat upright by the officers, at 6:45 p.m., the ambulance and medical crew, including paramedic Terry Baker, arrived. This was thirteen

minutes after the initial contact by dispatch. Prior to receiving the request for the ambulance to be expedited, the crew was advised that the scene was safe. Mr. Baker interpreted this to mean that the altercation was over. When Mr. Baker and the ambulance and medical crew arrived, Mr. Baker noticed that Mr. Williams' hands were cuffed behind his back, and he was leaning against a guardrail. A law enforcement officer, likely Deputy Pinson, approached Mr. Baker and told him that Mr. Williams had been in an unresponsive episode for one to two minutes. When Mr. Baker first saw Mr. Williams, Mr. Baker noted that he was not responding. He then noted that Mr. Williams was not talking or breathing. At no time prior to the arrival of the ambulance did anyone say or suspect that Mr. Williams was not breathing. Sergeant Chambers testified that, as far as he knew, Mr. Williams was not unconscious prior to the arrival of the ambulance.

Deputy Pinson removed Mr. Williams' handcuffs when it was determined that Mr. Williams was not breathing, and the officers and ambulance crew attempted life saving maneuvers on Mr. Williams. Mr. Baker immediately laid Mr. Williams back, with no response, and started rescue breathing. Per Mr. Baker's examination, Mr. Williams' throat was clear, meaning there was no obstruction. The life-resuscitating procedures administered by Mr. Baker were unsuccessful, so the crew put Mr. Williams in the ambulance and drove him to Phelps County Regional Medical Center ("PCRMC"). At 7:19 p.m. on August 20, 2005, Mr. Williams was pronounced dead at PCRMC by Dr. Francina Hoffman. Mr. Baker characterized Mr. Williams' illness assessment as cardiac arrest, sudden onset. However, Mr. Baker stated that this characterization was based on the information he received from individuals at the scene who purported to witness it.

Tests performed by PCRMC and by the St. Louis University Department of Toxicology on the blood of Jeffrey Williams were positive for the presence of cocaine. The autopsy performed by Dr. Jane Turner on August 21, 2005, lists the cause of death as "Excited Delirium associated with cocaine." The autopsy report lists the cause of death as "Accident." The day after the death, the size and contours of Mr. Williams' heart were found to be abnormal, and the left ventricle was both hypertrophied and dilated. Autopsy photographs of Mr. Williams were taken by Sergeant Ralph Roark. These photographs demonstrate the presence of: dirt and debris around Mr. Williams' mouth, nose and chin; marks and contusions on Mr. Williams' forehead and cheekbones; and an indentation on Mr. Williams' lower lip which appears consistent with his teeth, but the origin or significance of which is unknown.

The Transcribed Radio Activity report contains various statements made by the officers over the radio, including statements made by Lieutenant Chambers and Sergeant Arnold during the struggle to handcuff Mr. Williams, when the microphone from Lieutenant Chambers' radio became depressed. These statements were recorded and transcribed. First, the report reflects that Lieutenant Chambers said, "We need some help out here." The report then shows that Lieutenant Chambers said, "Jeff, Jeff I'm trying to help you," to which Mr. Williams replied "Help me help me."[8] Lieutenant Chambers also stated, "We better start an ambulance out here to check him out." The report also shows that Lieutenant Chambers told Mr. Williams, "Talk to me Jeff there is an ambulance that is going to be here in just a second okay [they're] going to help you okay."

---

[8]Lieutenant Chambers has acknowledged that Mr. Williams said, "Help me help me," in his presence, but while he was drafting his report of the occurrence, he did not remember this statement. Consequently, he did not include the statement in his report. Lieutenant Chambers acknowledged that the statement is significant in the matter.

Mr. Williams responded, "Nope." Lieutenant Chambers then asked that the ambulance be expedited.

Based on the events of August 20, 2005, and in compliance with Missouri State Highway Patrol ("MSHP") General Order No. 01-04, Lieutenant Chambers submitted a Use of Force Report for review by his superiors up the chain of command. Lieutenant Chambers drafted the Use of Force Report and the information contained in the Report came from him. One of the purposes of a Use of Force Report is so that an officer's superiors can make a determination as to whether the use of force justified in a particular instance. Lieutenant Chambers' Use of Force Report was reviewed by his superiors and his use of force on August 20, 2005 was deemed to be justified.

Both Lieutenant Chambers and Sergeant Arnold were trained by the MSHP to identify potentially dangerous situations and deescalate them whenever possible. They were also trained by the MSHP in proper arrest procedures and first aid, including CPR. Prior to the incident at issue, Lieutenant Chambers had received training in the use of force, deadly force, police tactics, and decision-making; Sergeant Arnold had received training in the use of force, justification for the use of force, and control techniques. In recruit training at the MSHP, troopers are taught about the danger that even handcuffed prisoners can pose. The officers knew of a case where a handcuffed suspect escaped from the back of a patrol car and was killed when struck by a vehicle, and of another case where an officer was shot and killed with his own weapon by a handcuffed suspect. The officers are also constantly aware of the danger to themselves and motorists inherent in conducting traffic stops and arrests along an interstate. When any person is outside a vehicle, the potential of serious physical injury or death is increased; therefore, the danger to the

officer, the arrestee and other motorists is always a factor of which officers are aware when making an arrest along an interstate. As of August 20, 2005, Lieutenant Chambers and Sergeant Arnold were aware that four members of the Missouri State Highway Patrol had been killed since 1988 when hit by vehicles while working along highways, including an incident on August 17, 2005, three days prior to the day in question.

Both Lieutenant Chambers and Sergeant Arnold had heard of restraint or positional asphyxia before the incident in question. The phenomenon of restraint or positional asphyxia was part of their training with the MSHP, and it was included in MSHP General Order 71-01, Section III.[9] This General Order applies only to transportation of a prisoner inside a vehicle; it does not apply to any situation outside a vehicle. This policy has been taught to members of the Highway Patrol. Lieutenant Chambers agreed that if a person is handcuffed behind their back and the person is lying face down on the ground, over a prolonged period of time it could compromise

---

[9]MSHP General Order 71-01 is entitled "Restraining and Transporting Prisoners" and reads, in pertinent part:

III.    PREVENTION OF POSITIONAL ASPHYXIA
A.    Restraint Method and Prisoner Position
Members will not transport prisoners who have been "hog-tied" or who are lying on their stomachs. Should a prisoner being transported lie face down, the transporting member will reposition the prisoner so that the prisoner's breathing can be properly monitored.
B.    Monitoring of Prisoner
If it becomes necessary to transport a prisoner in a prone position, the prisoner will be closely and continuously monitored. Members should be particularly observant of prisoners who have displayed erratic behavior, appear to be under the influence of drugs, or have been subjected to a neck restraint or OC aerosol.

(Pl. Ex. 20, doc. #47-25, p.2).

that person's breathing and possibly cause death. Sergeant Arnold stated that he has read about police custody deaths that were alleged to be from positional asphyxia.

Deputy Vogeler and Deputy Pinson were trained by Phelps County to identify potentially dangerous situations and deescalate them whenever possible. They were also trained in proper arrest procedures and in first aid, including CPR. Prior to the incident in question, both Deputies were aware of the phenomenon of restraint or positional asphyxia . Deputy Vogeler believed that the topic was addressed in the Phelps County operating procedure manual; Deputy Pinson did not recall being trained by Phelps County regarding the phenomenon. Deputy Vogeler's understanding of positional asphyxia was that there is a concern when subjects are handcuffed, hog-tied, and laid face-down in the back of a patrol car.

## III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its very terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are

those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Further, if the nonmoving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the absence of any genuine issue of material fact. *Id.* at 323; *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the nonmoving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e)(2). When the burden shifts, the nonmoving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the nonmoving party must show there is sufficient evidence favoring the nonmoving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson*, 943 F.2d at 883.

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

## IV.    DISCUSSION

### A.    UNREASONABLE AND EXCESSIVE FORCE CLAIM

First, Plaintiff asserts a 42 U.S.C. § 1983 unreasonable force claim against each of the following Defendants in this case: Lieutenant Chambers, Sergeant Arnold, Deputy Pinson, and Deputy Vogeler (collectively, "the Defendant Officers"). Plaintiff argues that each of these men engaged in actions that were "objectively unreasonable and constituted the use of excessive force," in violation of Jeffrey Williams' constitutional rights. (Pl.'s Complaint, doc. #1, pp.5-8).

"'The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures.'" *Ngo v. Storlie*, 495 F.3d 597, 604 (8th Cir. 2007) (quoting *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006)). Fourth Amendment excessive force claims are analyzed "under a reasonableness standard to determine whether, in light of the facts and circumstances, the officer's actions were objectively reasonable." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal

quotations and citations omitted). The Court must consider factors such as the severity of the suspected crime, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting or attempting to evade arrest. *Id.* Further, the determination of reasonableness must allow for the fact that "police officers are often forced to make split-second judgments- in circumstances that are tense, uncertain, and rapidly evolving- about the amount of force that is necessary in a particular situation." *Gill*, 546 F.3d at 562 (citing *Graham*, 490 U.S. at 396-97). This inquiry is objective, questioning "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

In this case, the Court finds that the use of force against Jeffrey Williams by the Defendant Officers was objectively reasonable and did not violate Mr. Williams' constitutional rights. Lieutenant Chambers and Sergeant Arnold had several encounters with Mr. Williams on August 20, 2005, before they became aware of the outstanding capias warrant, calling for his arrest. Upon learning of the warrant, the officers were permitted, and even required, to arrest Mr. Williams. However, when they located Mr. Williams and informed him that they were going to arrest him, Mr. Williams became non-compliant and the events became "tense, uncertain, and rapidly evolving." *Gill*, 546 F.3d at 562 . Initially, he stood still and ignored the officers' instructions to put his hands behind his back. He then began moving uncontrollably after Sergeant Arnold put his left arm in an arm bar and Lieutenant Chambers grabbed his right arm. The officers continuously told Mr. Williams to stop resisting and to get down on the ground, but he refused and violently fought back. After Sergeant Arnold applied a lateral vascular neck restraint, Mr. Williams dropped to the ground and used what appeared to be a ground fighting technique to

knock Sergeant Arnold off balance. Later, Mr. Williams grabbed the bottom of Lieutenant

Chambers' holster, which caused him to think that Mr. Williams was reaching for his weapon.

The officers attempted to utilize various techniques to get Mr. Williams under control: Lieutenant

Chambers sprayed Mr. Williams with OC pepper spray twice, Sergeant Arnold used his

expandable baton to deliver a blow to Mr. Williams' right knee, and Lieutenant Chambers used

his knee to strike the inside of Mr. Williams' thigh. None of these techniques had any effect on

Mr. Williams. All of this took place along the highway, and sometimes the officers were actually

struggling with Mr. Williams in the middle of Interstate 44. When Lieutenant Chambers and

Sergeant Arnold were finally able to get Mr. Williams to the ground, he continued to struggle. It

ultimately took three men to get handcuffs on Mr. Williams.[10]

Immediately after Mr. Williams was handcuffed, he stopped resisting, but Lieutenant

Chambers, Sergeant Arnold and Mr. Prestage kept their hands on him to hold him down.

Contrary to Plaintiff's suggestion, the evidence does not establish that any of these men were

laying on Mr. Williams, or that they were "literally on top of him." (Pl.'s Response, doc. #47,

p.17). Rather, the men were applying just enough pressure to prevent Mr. Williams from getting

up and fleeing the scene. Considering Mr. Williams' erratic and violent behavior before he was

handcuffed, this application of pressure is entirely reasonable. Moreover, soon after the men let

up their pressure, i.e., when Mr. Prestage removed his hands to pour water over Mr. Williams'

---

[10]For the purpose of this Motion, Plaintiff asserts that his claim of excessive force begins when the handcuffs were placed on Mr. Williams. Additionally, Plaintiff implies that the events that occurred before this time are not relevant. This Court disagrees. Mr. Williams' struggle against the defendant police officers before they were able to handcuff him is part of the "facts and circumstances" that this Court must consider in determining whether the officers' actions were objectively reasonable. *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

face, Mr. Williams began struggling and attempting to get up again. The men resumed their positions, still exerting just enough pressure to prevent Mr. Williams from getting up. During this time, Mr. Williams still had freedom of movement, and he took advantage of it. Even after Deputies Vogeler and Pinson arrived, there is evidence that Mr. Williams was still moving on the ground, still trying to get away from the officers holding him. All of the Defendant Officers, including Deputy Vogeler and Deputy Pinson, who took over for Lieutenant Chambers and Sergeant Arnold, used a minimal amount of force that was reasonable under the circumstances. While there is some evidence that Deputy Pinson saw Mr. Prestage actually lying on Mr. Williams' torso at some point in time, this evidence does not make the force used unreasonable, considering the initial struggle and Mr. Williams' continued resistence.[11] As soon as Mr. Williams had stopped moving completely, the Defendant Officers asked him if he was okay, and then immediately turned him over when he didn't respond.

The above analysis establishes that the use of force against Jeffrey Williams by the Defendant Officers was objectively reasonable and did not violate Mr. Williams' constitutional rights. This conclusion is consistent with Eighth Circuit case law.[12] *See, e.g.*, *Brandt v. Davis*, 191 F.3d 887, 891-92 (8th Cir. 1999) (finding that it was reasonable for officers to hogtie defendant and place him in the patrol car on his stomach after defendant engaged in violent behavior, such as kicking the doors of the car, banging his head on the divider, kicking an officer in the stomach, and consistently pulling free from the officers' restraints); *Mayard v. Hopwood*,

---

[11]Moreover, Mr. Prestage is not a party to the present lawsuit.

[12]Although the Court notes that there do not appear to be any Eighth Circuit cases that involve positional asphyxia and the use of a prone restraint. The cases that the Eighth Circuit has addressed involve the use of other restraint techniques, such as a hogtie.

105 F.3d 1226, 1228 (8th Cir. 1997) (finding that placing defendant in a hobble restraint after violently resisting arrest was reasonable, but slapping, punching, and using a racial slur against defendant after she was handcuffed was not reasonable). Additionally, other Circuits that have examined analogous, even more severe, cases involving prone restraint and asphyxia have found the force used to be reasonable. *See, e.g.*, *Gregory v. County of Maui*, 523 F.3d 1103, 1107-09 (9th Cir. 2008) (struggle with decedent did not amount to unreasonable force, as it was proportionate to the severity of the offense and threat he posed to the officers); *Giannetti v. City of Stillwater*, 216 Fed. App'x. 756, 765-66 (10th Cir. 2007) (finding no unreasonable force when officers placed hands and knees on decedent, who continued to actively resist after being placed in a prone position); *Bornstad v. Honey Brook Twp.*, 211 Fed. App'x. 118, 123-25 (3d Cir. 2007) (finding that placing a knee on decedent's chest and turning him over on his stomach did not constitute unreasonable force when decedent was actively resisting arrest, even though he stated that he was having trouble breathing); *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000) (finding no unreasonable force when officers sprayed decedent with pepper spray, placed him face down on the ground, and placed a knee on the decedent's neck or back while handcuffing him); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (finding that placing decedent on floor in prone position with hands and legs restrained was not unreasonable force because it was necessary to protect the safety of the officers and others present).

The cases cited by Plaintiff in support of his opposition to Defendants' Motion for Summary Judgment are distinguishable from the case at hand. First, Plaintiff cites *Henderson v. Munn*, 439 F.3d 497 (8th Cir. 2006), to support his argument that the Defendant Officers used

unreasonable force in arresting Jeffrey Williams.  However, in *Henderson*, the officer conduct that

the Eighth Circuit found to be unreasonable was specifically the use of pepper spray after the

arrestee was handcuffed, under control, and lying face down on the ground.  *Id.* at 502-03.  In this

case, on the other hand, Mr. Williams continued to resist and attempt to get up after he was

handcuffed, and the Defendant Officers only used minimal force against him.  The Defendant

Officers did not use pepper spray, nor did they hit, kick or otherwise strike Mr. Williams after he

was handcuffed.

Plaintiff also cites *Weigel v. Broad*, 544 F.3d 1143, 1147 (10th Cir. 2008), in support of

his unreasonable force argument.  In addition to not being binding precedent on this Court, the

Tenth Circuit case is also distinguishable from the present case.  In *Weigel*, an opinion by a

divided court,[13] the Tenth Circuit determined that the following constituted unreasonable force: a

by-stander laid across the back of the decedent's legs; an officer applied pressure to the

decedent's upper body with one or both knees and his hands; another officer straddled the

decedent's upper thighs and buttocks, and held the decedent's arms in place; and another

bystander used plastic tubing or cord to bind the decedent's feet.  *Id.* at 1148.  This is

substantially more force that the Defendant Officers used in this case.  Additionally, the Tenth

Circuit noted that the pressure was applied to the decedent "after it was clear that the pressure

was unnecessary to restrain him."  *Id.* at 1152.  In this case, the Court has not found that the

Defendant Officers continued to apply pressure to Mr. Williams after it was no longer necessary;

rather, the evidence of Mr. Williams' continued resistance suggests that it was indeed necessary.

---

[13]The case was heard by a three-judge panel; in addition to the court's opinion, one judge
filed a concurring opinion and another judge filed a dissent.

The Court expresses genuine remorse over the unfortunate outcome of the events underlying this case. However, "the mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment-a plaintiff must identify the *specific* unreasonable conduct that caused his or her injuries." *Abdullahi v. City of Madison*, 423 F.3d 763, 770-71 (7th Cir. 2005). Plaintiff has failed to establish such unreasonable conduct in this case and the Court finds that the actions of the Defendant Officers did not amount to unreasonable force. Thus, there was no constitutional violation, and the Court need not reach the issue of whether the Defendant officers are entitled to qualified immunity. The Court finds that Plaintiff's excessive force claim against the Defendant Officers must fail.

The Court finds that no genuine issue of material fact exists regarding the use of excessive force by Defendant Officers Chambers, Arnold, Pinson, and Vogeler, and Defendants are entitled to summary judgment on this claim.

### B.      STATE LAW WRONGFUL DEATH AND PERSONAL INJURY CLAIMS

Additionally, Plaintiff asserts a supplemental Missouri state wrongful death claim and a supplemental Missouri state law personal injury claim against each of the following Defendants in this case: Franklin Chambers, George Arnold, Aaron Pinson, Matthew Vogeler, and Phelps County, Missouri. Plaintiff alleges that these Defendants engaged in "conduct exhibiting a reckless disregard for the safety of others, including [Jeffrey] Williams." (Pl.'s Complaint, doc. #1, pp.9-13).

Defendants argue that Plaintiff's state law claims must fail because they are entitled to official immunity. Under the doctrine of official immunity, public employees are protected "from liability for alleged acts of negligence committed during the course of their official duties for the

performance of discretionary acts."[14]  *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008) (en banc).  This immunity does not apply to "torts committed when acting in a ministerial capacity."  *Id.*  As a result, the Court must first inquire into whether the Defendant Officers' acts were discretionary or ministerial.

"Whether an act is discretionary or ministerial depends on the 'degree of reason and judgment required' to perform the act."  *Davis v. Lambert-St. Louis Intern. Airport*, 193 S.W.3d 760, 763 (Mo. 2006) (en banc) (quoting *Kanagawa v. State By and Through Freeman*, 685 S.W.2d 831, 835 (Mo. 1985) (en banc)).  A ministerial act "is one 'of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed."  *Southers*, 263 S.W.3d at 610 (quoting *Kanagawa*, 685 S.W.2d at 835).  Conversely, discretionary acts require "the exercise of reason in the adaption of means to an end and discretion in determining how or whether an act should be done or course pursued."  *Id.*  This inquiry must be completed "on a case-by-case basis, considering: (1) the nature of the public employee's duties; (2) the extent to which the act

---

[14]Plaintiff incorrectly states that "official immunity does not apply to police officers who respond to <u>non-emergencies</u>."  (Pl.'s Response, doc. #47, p.24).  In support of this statement, Plaintiff cites *Southers v. City of Farmington*, 263 S.W.3d 603, 628 (Mo. 2008) (en banc).  Although the cited portion of *Southers* initially appears to support this statement, an in-depth examination of that case reveals the falsity of the statement.  *Southers* dealt specifically with the issue of whether official immunity protects officers from civil liability for events that occur while driving.  Indeed, in support of the statement at issue, the *Southers* court cited *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760 (Mo. 2006) (en banc), which included the following language: "Police officers, *driving* in non-emergency situations, do not benefit from official immunity."  *Id.* at 763 (emphasis added).

involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." *Id.*

In this case, it appears that the acts in question were discretionary. From the very beginning of the struggle, the Defendant Officers were making judgment calls regarding how to get Mr. Williams under control to execute the arrest. They had to decide what means of restraint would be least intrusive, but still effective; and, when the less intrusive techniques proved unsuccessful, the Defendant Officers had to attempt other techniques. When they were finally able to handcuff Mr. Williams and get him on the ground, the Defendant Officers had to determine how to handle Mr. Williams' continued struggle to get up, considering that they were all astoundingly close to Interstate 44 and the cars traveling thereon. All of these decisions required the Defendant Officers to exercise their professional judgment in carrying out the arrest of Mr. Williams. Moreover, it is undisputed that making an arrest is a discretionary act that is protected by official immunity.[15] (Defs.' Memo. in Support of Mtn., doc. #35, p.35; Pl.'s Response, doc. #47, p.26). *See also Robinette v. Jones*, 2005 WL 3371079, at *6 (W.D. Mo. Dec. 12, 2005) ("Arrests, including any harmful touching, are generally considered discretionary acts that fall under the ambit of official immunity."). Thus, the Court finds that the actions Plaintiff contests are discretionary in nature, and, thus, that the official immunity defense is applicable.

---

[15] Plaintiff asserts that the discretionary act of making an arrest ends upon the application of handcuffs. While that may be true in some cases, in this particular case, the Court finds that the Defendant Officers had to continue to exercise their discretion well after they placed the handcuffs on Mr. Williams because of his continued resistence, flight risk, and proximity to the interstate.

Nevertheless, it is important to remember that employees may still be liable for discretionary acts if their "conduct is willfully wrong or done with malice or corruption." *Southers*, 263 S.W.3d at 610. Plaintiff has not made any such allegations in this case, nor does the evidence suggest that the Defendant Officers engaged in willful or malicious conduct. Plaintiff does, however, assert that the actions of the Defendant Officers falls under the "arrogant disregard exception" to official immunity. Plaintiff asserts that the Missouri Supreme Court created the "arrogant disregard exception" to official immunity by stating, "[w]e agree that public officials may be expected to keep their wits about them, and must not assume an attitude of arrogant disregard toward the safety of members of the public." *Green v. Denison*, 738 S.W.2d 861, 867 (Mo. 1987) (en banc), *abrogated on other grounds by Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760 (Mo. 2006) (en banc). However, since the *Green* opinion was issued more than twenty years ago, this so-called "exception" has not been recognized or applied by any other Missouri state court.[16] As a result, the Court will not apply the "exception" in this case either. Moreover, there is absolutely no evidence that any of the Defendant Officers acted with disregard to the safety of the public. Rather, the evidence clearly demonstrates that each of the Defendant Officers were concerned about maintaining control of Mr. Williams and keeping him

---

[16]The only cases that have even mention this "arrogant disregard exception" do not provide persuasive authority for this Court. These cases include a dissenting opinion in a 1990 Eighth Circuit case, *Murray v. Leyshock*, 915 F.2d 1196, 1205-06 (8th Cir. 1990) (Bright, J., dissenting), and two Orders issued by judges presiding in the United States District Court for the Western District of Missouri, *Parris v. Huttie*, 2007 WL 2434058, at *10 (W.D. Mo. Aug. 21, 2007), and *Boyle v. City of Liberty, Mo.*, 833 F. Supp. 1436, 1443 (W.D. Mo. 1993). Of the two Western District of Missouri cases, the "exception" was only analyzed in one case; and in that case, the court merely stated that it was possible that the "exception" could prevent the defendants from relying on official immunity. *Boyle*, 833 F. Supp. at 1443 (noting that "it is possible that those facts could create an inference of 'arrogant disregard' and defeat the protection of official immunity").

off of the interstate in order to prevent him from causing harm to himself, the other officers, or members of the general public.

Thus, the Court finds that the actions of the Defendant Officers at issue in this case were discretionary and, therefore, they are entitled to protection from Plaintiff's state law claims under the doctrine of official immunity. Additionally, with respect to Phelps County, "[b]ecause the officers' discretionary actions are entitled to official immunity, the [County] has no vicarious liability." *Hayek v. City of St. Paul*, 488 F.3d 1049, 1057 (8th Cir. 2007).

The Court finds that no genuine issue of material fact exists regarding Plaintiff's state law wrongful death and personal injury claims against the Defendant Officers and Phelps County. Thus, Defendants are entitled to summary judgment on this claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Joint Motion for Summary Judgment [doc. #34] is **GRANTED**. Plaintiff's claims against Defendants are **DISMISSED WITH PREJUDICE**.

Dated this 5th Day of February, 2010.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE